**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| STEVE STEPHENS, | CASE NO. 1:15-cv-02029-YK-GBC |
| Plaintiff, | (JUDGE KANE) |
| | (MAGISTRATE JUDGE COHN) |
| v. | |
| CAROLYN W. COLVIN, COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S APPEAL |
| | Docs. 1, 9, 10, 13, 20, 21 |
| Defendant. | |

## REPORT AND RECOMMENDATION

### I.    Procedural Background

On February 27, 2012, Steve Stephens ("Plaintiff") filed as a claimant for disability benefits under Title II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1382-1383 ("Act") and Social Security Regulations, 20 C.F.R. §§ 404 et seq., 416 et seq., with a last insured date of September 30, 2014,[1] and claimed a disability onset date of April 25, 2011.  (Administrative Transcript (hereinafter, "Tr."), 13).

---

[1] Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. 42 U.S.C. §§ 415(a) and 416(i)(1). The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." *See* 42 U.S.C. § 416(i)(2); *accord Renfer v. Colvin*, No. 3:14-CV-611, 2015 WL 2344959, at *1 (M.D. Pa. May 14, 2015).

After the claim was denied at the initial level of administrative review, the Administrative Law Judge (ALJ) held a hearing on January 29, 2014.  (Tr. 33-57).  On May 15, 2014, the ALJ found that Plaintiff was not disabled within the meaning of the Act.  (Tr. 10-32).  Plaintiff sought review of the unfavorable decision, which the Appeals Council denied on September 14, 2015, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner.  (Tr. 1-5).

On October 14, 2015, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal a decision of the Commissioner of the Social Security Administration ("SSA") denying social security benefits.  (Doc. 1).  On December 22, 2015, the Commissioner ("Defendant") filed an answer and an administrative transcript of proceedings.  (Doc. 9, 10).  On February 4, 2016, Plaintiff filed a brief in support of the appeal.  (Doc. 13) ("Pl. Brief")).  On April 25, 2016, Defendant filed a brief in response.  (Doc. 20 ("Def. Brief")).  On May 2, 2016, Plaintiff filed a reply brief.  (Tr. 21 ("Reply")).  On November 8, 2016, the Court referred this case to the undersigned Magistrate Judge.

## II.    Relevant Facts in the Record

### A. Education, Age, and Vocational History

Plaintiff was born in August 1968 and classified by the Regulations as a younger individual at the time of the ALJ decision.  (Tr. 26); 20 C.F.R. §

404.1563(c).  He had a GED and past work experience as a dishwasher/kitchen helper, prep cook, painter, and laborer for a cemetery and for a grocery store.  (Tr. 52, 174, 183-90, 227-31).  Plaintiff asserts that he is disabled due to several impairments, including low back pain, bilateral knee problems, PTSD, depression, paranoia, suicidal ideation, and violent outbursts.  (Tr. 173).  Earnings reports demonstrate that he earned three to four quarters of coverage from 1988 to 1999, 1992 to 1998, 2000 to 2001, 2004 to 2009.[2]  (Tr. 165).

### B. Relevant Treatment History and Medical Opinions

### 1.    Pinnacle Health

On April 25, 2011, Plaintiff sought emergency room (ER) treatment for right knee and for low back pain after he was struck on the front side of his right knee by a car.  (Tr. 250-58).  X-rays of Plaintiff's right knee showed a small effusion with no fracture or dislocation.  (Tr. 259).  He was diagnosed with a right knee contusion.  (Tr. 258).

### 2.    Orthopedic Institute of PA: William W. DeMuth, M.D.

On August 24, 2011, Plaintiff went to Dr. DeMuth, an orthopedic surgeon, for complaints of radicular pain from his low back to his right knee.  (Tr. 274).  Plaintiff reported that he was struck by a vehicle while he was walking.  (Tr. 274).

---

[2] A quarter of coverage represents a minimum amount of taxable income based on a statutory formula that reflects the national average wage. *See Weidman v. Colvin*, No. CV 3:14-552, 2015 WL 5829788, at *11 n.4 (M.D. Pa. Sept. 30, 2015).

Plaintiff was fully ambulatory.  (Tr. 274).  He walked with a decided limp and exhibited positive straight leg raising on the right.  (Tr. 274).  He did not have signs of myelopathy.  (Tr. 274).  Dr. DeMuth opined that Plaintiff had posttraumatic lower back pain with right leg sciatica.  (Tr. 274).  An MRI of Plaintiff lumbar spine dated August 30, 2011, showed lumbar spondylosis with a mild disc protrusion at L5-S1.  (Tr. 396).

On September 26, 2011, Plaintiff stated that his main problem was his right leg which, he claimed, gave way when he walked.  (Tr. 273).  Dr. DeMuth ordered an MRI of Plaintiff's right knee, which showed a medial meniscus tear.  (Tr. 394).  On November 18, 2011, Plaintiff underwent right knee arthroscopy to address a meniscus tear.  (Tr. 271, 310).

On December 2, 2011, Plaintiff sought follow-up treatment and reported feeling stiff and sore, but otherwise doing well.  (Tr. 270).  Dr. DeMuth observed that Plaintiff moved around with a slight limp, that his range of motion was stiff, but he was ambulating, and Plaintiff reported that his left side was also bothering him due to the accident.  (Tr. 270).  On January 16, 2012, Plaintiff reported back pain and suicidal thoughts and depression due to his inability to work and due to the stiffness in his knees.  (Tr. 269).  Dr. DeMuth noted that Plaintiff seemed to have stiffness with range of motion, and "seemed to have exaggerated discomfort

for what the clinical exam suggested." (Tr. 269). Dr. DeMuth diagnosed Plaintiff with mild degenerative joint disease of the knees and depression. (Tr. 269).

On February 27, 2012, Plaintiff sought follow-up treatment for his right knee. (Tr. 268). Dr. DeMuth noted that Plaintiff seemed to have improved, had some stiffness in his leg, and that he did not find any physical reason to explain why Plaintiff's knee was locking. (Tr. 268). Dr. DeMuth opined that Plaintiff was unable to work until his knee symptoms resolve. (Tr. 268).

On April 25, 2012, Dr. DeMuth stated that Plaintiff had some residual swelling of his right knee and was mildly numb in the anterior aspect of his leg. (Tr. 282). Plaintiff could otherwise flex his knee to 120 degrees and had full extension. (Tr. 282). Dr. DeMuth stated that "all in all [Plaintiff] was doing well." (Tr. 282).

On October 19, 2012, Dr. DeMuth observed Plaintiff limping possibly due to his right knee. (Tr. 386). Dr. DeMuth noted that Plaintiff seemed a "bit hyperactive" and did not appear to be as depressed as he had been on previous visits. (Tr. 386). Dr. DeMuth noted tenderness along his right knee, but no ligament instability. (Tr. 386). Plaintiff had full range of motion of his right shoulder, as well as his right hip. (Tr. 386). There were no signs of myelopathy. (Tr. 386). X-rays of Plaintiff's right knee showed "very mild" degenerative changes. (Tr. 386). X-rays of his right shoulder were normal. (Tr. 386). Dr.

DeMuth injected Plaintiff's right knee and prescribed Ultram for pain relief.  (Tr. 386).  On November 7, 2012, Plaintiff had a normal range of motion for the neck and normal gait.  (Tr. 372-73).

On June 14, 2013, Plaintiff sought treatment for his right thumb and right knee.  (Tr. 384).  Dr. DeMuth observed full range of motion in the thumb with an intact neurovascular examination.  (Tr. 384).  Upon examination of Plaintiff's knee, Dr. DeMuth noted no ligament instability and did not note any remarkable findings.  (Tr. 384).  Dr. DeMuth assessed Plaintiff with chondromalacia and post-traumatic right hand pain.  (Tr. 384).

On August 7, 2013, Plaintiff reported ongoing right knee pain which caused difficulty going up and down steps.  (Tr. 405).  Plaintiff had pain with range of motion of his right knee, but no ligament instability.  (Tr. 405).  Dr. DeMuth noted minor right knee effusion was noted.  (Tr. 405).  X-rays of Plaintiff's knees showed no obvious arthritis and x-rays of Plaintiff's lumbar spine were normal.  (Tr. 405).  Dr. DeMuth injected Plaintiff's right knee and advised Plaintiff to follow up in one year.  (Tr. 405).

### 3.    Tristan Associates

A right lower extremity Venus Doppler, performed December 20, 2011, revealed normal compressibility of the femoral and popliteal veins, indicating absence of thrombus at the knee and above.  (Tr. 311).

### 4.    Holy Spirit Hospital

On April 27, 2011, Plaintiff reported lower back pain, bilateral leg pain, as well as shoulder and neck pain due to a recent auto-pedestrian collision. (Tr. 312-16). It was noted that he was ambulatory, had multiple contusions, and examination of Plaintiff's neck revealed that it was non-tender and demonstrated a painless range of motion. (Tr. 313, 315-16). An x-ray of Plaintiff's lumbar spine showed mild arthritic changes with no acute fracture. (Tr. 317). An x-ray of his cervical spine showed mild degenerative changes at C5-C6 and moderate spondylosis or possible skeletal hyperostosis in his lower cervical spine. (Tr. 317).

On December 26, 2012, Plaintiff sought treatment for injury for his right thumb and right knee. (Tr. 325-36). It was noted that Plaintiff was ambulatory. (Tr. 333). Examination of Plaintiff's back revealed no costovertebral angle ("CVA") tenderness, and no vertebral tenderness. (Tr. 331). Examination of Plaintiff's neck revealed that it was non-tender and demonstrated a painless range of motion. (Tr. 331). Examination of Plaintiff's thumb revealed tenderness and mild swelling. (Tr. 331). An x-ray of Plaintiff's right thumb showed no abnormality. (Tr. 335). An x-ray of his right knee showed minimal degenerative changes. (Tr. 336).

///

///

### 5.      Pressley Ridge: Amy Saracino, D.O.

In a psychiatric evaluation dated December 13, 2010, Plaintiff reported that he no prior inpatient or outpatient psychiatric history.  (Tr. 339).  Plaintiff reported no history of suicide attempts or any psychotropic drug trials.  (Tr. 339).  Plaintiff reported a history of head injuries and motor vehicle accidents, and reported that he currently was not taking any medication.  (Tr. 339).  Plaintiff reported taking criminal justice classes for an online university and planned to transfer the credits to a local community college.  (Tr. 340).  Plaintiff reported twice daily cannabis use and no alcohol use or recent use of drugs other than cannabis.  (Tr. 340).

Plaintiff reported that he had thought a lot about death as a result of things he had witnessed.  (Tr. 338).  Plaintiff reported that, at times, he thinks he sees faces in the carpet or in the concrete which are "evil." (Tr. 338).  Plaintiff reported that when he was young he witnessed a man get run over by a steamroller; prior work experience which involved cremating individuals; sharing a jail cell with a convicted murder who described, in detail, his killings, and; as a result of testifying against the convicted murderer, he was attacked by a taxi driver who attempted to poison him.  (Tr. 338-39).  Plaintiff reported some anxiety surrounding these intrusive thoughts and flashbacks including increased heart rate and chest pain. (Tr. 339).  He reported feeling depressed more days than not in a given year.  (Tr. 339).  Plaintiff reported that he cries for no reason, experienced a reduced appetite

and decreased energy, had ongoing trust issues, and was somewhat defensive.  (Tr. 339).  Plaintiff reported that he once intentionally burned himself to serve as a distraction from his feelings.  (Tr. 339).  Plaintiff denied any history consistent with manic episodes including periods of decreased need for sleep or increased energy, did not describe any clear grandiose delusions, and did not report any history of auditory hallucinations or clear delusions.  (Tr. 339).  Dr. Saracino noted that Plaintiff presented "with some unrealistic thoughts in discussing events that have happened to him."  (Tr. 339).  Plaintiff also reported that when thinking of death or violent thoughts, it is easier to think of himself as someone he named "Jack."  (Tr. 339).  Plaintiff acknowledged that there were not really two parts of him and Dr. Saracino posited that Plaintiff may have used "Jack" as a possible coping mechanism.  (Tr. 339).

Dr. Saracino noted that Plaintiff's recent and remote memory appeared grossly intact, was oriented x3, had normal speech, and broad affect.  (Tr. 340-341).  Dr. Saracino noted small healing burns on his bilateral hands and wrists.  (Tr. 341).  Plaintiff reported "possible hallucinations" which Dr. Saracino opined were "most likely illusions or a manifestation of anxiety or posttraumatic experiences including hypervigilance."  (Tr. 341).  Dr. Saracino noted that Plaintiff sat in the chair and steadily looked at the carpet for a face which would be "atypical of an actual visual hallucination."  (Tr. 341).  Dr. Saracino opined that

there was no "evidence of clear delusional thinking at the time of the interview" and although Plaintiff described a certain amount of hypervigilance and paranoid thinking at times, such was not to the point of reaching the realm of paranoid delusions.  (Tr. 341).

Dr. Saracino noted that there was possibly obsessional thinking, however, Plaintiff did not describe any compulsive behaviors associated with these intrusive thoughts.  (Tr. 341-342).  Dr. Saracino diagnosed Plaintiff with: 1) dysthymic disorder; 2) rule out posttraumatic stress disorder, chronic type; 3) rule out obsessive compulsive disorder, and; 4) cannabis dependence.  (Tr. 342).  Dr. Saracino assessed Plaintiff with a GAF score of 55,[3] prescribed a trial of Prozac 20mg, recommended that Plaintiff abstain from drug use, and recommended individual therapy.  (Tr. 342).

---

[3] *Schwartz v. Colvin*, 3:12-CV-01070, 2014 WL 257846 at *5, n. 15 (M.D. Pa. Jan. 23, 2014) ("The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th ed.1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. *Id.* The score is useful in planning treatment and predicting outcomes. *Id.* The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination. The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if *either* the symptom severity *or* the social and occupational level of functioning falls within that range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the *worse* of the two. . . . . A GAF score of 31–40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. *Id.* A GAF score of 41–50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. *Id.* A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. *Id.*").

On March 1, 2011, Plaintiff was discharged from Pressley Ridge for refusal to comply with attendance requirements. (Tr. 410-412). He was diagnosed with dysthymic disorder and assessed with a GAF score of 55. (Tr. 411). On November 5, 2013, Plaintiff reported he would like to stop seeing the images of dead people. (Tr. 408). Plaintiff was diagnosed with dysthymic disorder and assessed with a GAF score of 50. (Tr. 408). On November 12, 2013, he was discharged due to his return to jail based on a parole violation. (Tr. 406-07). He was assessed with a GAF score of 50 and it was noted that minimal progress was made toward reaching the treatment goals. (Tr. 406).

### 6. Pinnacle Health: Mary Bonar, D.O.; Lance Hildrew, D.O.; Joseph Benaknin, D.O.; Chris Delong, R.N.

On November 7, 2012, Plaintiff sought treatment for ear pain. (Tr. 372-73). During examination, Mr. Delong noted that Plaintiff had a normal range of motion for the neck, normal gait, normal affect, and presented with a minimal risk for suicide. (Tr. 372-73).

On February 26, 2013, Plaintiff sought ER treatment for hematuria and reported vague symptoms of abdominal pain. (Tr. 364-69). Plaintiff denied back pain or injury, denied neck pain, but reported a history of myalgias. (Tr. 364). Plaintiff denied a history of alcohol abuse, anxiety, depression, or drug abuse. (Tr. 364). Plaintiff's gait was normal. (Tr. 365). Upon examination, Dr. Benaknin observed that Plaintiff had a normal range of motion in his neck, normal range of

motion for his back with no costovertebral tenderness, and a normal range of motion in the upper and lower extremities. (Tr. 365). Dr. Benaknin noted that Plaintiff presented with a normal affect and judgment. (Tr. 365). Plaintiff was diagnosed with kidney stones and abdominal pain. (Tr. 364, 368).

On March 28, 2013, Plaintiff sought treatment for severe pain related to kidney stones. (Tr. 357-58). Plaintiff reported a history of chronic pain of eight out of ten where ten indicated the greatest amount of pain. (Tr. 358). Plaintiff stated that he took Tylenol #3 to treat his pain because someone accused him of being addicted to Vicodin. (Tr. 358). He was anxious and alleged suicidal ideation and auditory hallucinations, however, Dr. Hildrew noted that Plaintiff presented as a minimal suicide risk. (Tr. 358).

On June 5, 2013, Plaintiff sought follow-up treatment for kidney stones. (Tr. 350). Dr. Bonar noted that Plaintiff was ambulatory with a steady gait. (Tr. 352). Plaintiff reported experiencing pain for four months and missed his last urology appointment do to incarceration. (Tr. 350). Plaintiff reported a current pain of ten out of ten and that his pain had been constant for three days, however, he had not taken any medication to address his pain. (Tr. 350). Plaintiff reported that although he had previously been taking Tylenol #3 for his knee pain, he had not been taking pain medication for a period of time. (Tr. 350). Plaintiff reported that he smoked marijuana at times. (Tr. 350). Upon examination, Dr. Bonar noted

that Plaintiff's: 1) musculoskeletal examination was unremarkable; 2) psychiatric examination revealed normal affect and judgement; 3) neck examination demonstrated a normal range of motion, and; 4) back examination demonstrated costovertebral tenderness on the left.  (Tr. 350-51).  Dr. Bonar recommended that Plaintiff follow up with an urologist and noted that Plaintiff could take over-the-counter medications to address pain.  (Tr. 351).

### 7.    Medical Records during Incarceration

On June 18, 2012, Plaintiff reported "seeing" the people that he cremated during his prior employment.  (Tr. 499, 529). He was diagnosed with PTSD by history. (Tr. 529).  In records on June 15, 2012, June 18, 2012, April 25, 2013, and May 17, 2013, Plaintiff generally was alert and oriented x3 and exhibited no signs of depression.  (Tr. 413-16, 428).  Plaintiff reported that he was worried about his car, girlfriend, rent, and his knee.   (Tr. 415, 427).   The form indicated that Plaintiff's mobility was not restricted in any way. (Tr. 418).  Plaintiff reported that he never had a head injury and that Plaintiff indicated that he would need to see a psychologist.  (Tr. 420).  Plaintiff indicated that he had joint problems and surgery in the right knee.  (Tr. 422).  Norco and prednisone were listed as his medication. (Tr. 423).  It was noted that Plaintiff's lower right knee had a well healed surgical scar and demonstrated pain with slight touch.  (Tr. 425).  Plaintiff reported that he had PTSD.  (Tr. 433).

On June 15, 2012, and April 25, 2013, it was noted that Plaintiff would get new intake opiate detox checks over a period of days.  (Tr. 487-512).  From June 18, 2012, to September 18, 2012, and starting April 26, 2013, Plaintiff was placed on gym and work restrictions and lower bunk bed assignment.  (Tr. 454, 469-70).

On April 25, 2013, Plaintiff reported that joint problems which included bilateral knee surgery in addition to hip pain.  (Tr. 435).  Plaintiff reported a history of depression, hypervigilance, and PTSD symptoms. (Tr. 437).  Plaintiff's gait was within normal limits and right knee demonstrated full range of motion with discomfort, positive McMurray's sign and positive left Costovertebral angle tenderness.  (Tr. 439).  Plaintiff was cleared to perform prison work from an infection disease standpoint.  (Tr. 439).

On April 26, 2013, it was noted that Plaintiff had no mental health restrictions and he refused to take the prescribed Prozac because he did not like the way it made him feel.  (Tr. 530).  During the examination, Plaintiff denied suicidal thoughts, denied hallucinations, and presented with appropriate conversation, normal speech, and euthymic mood.  (Tr. 530).  On April 29, 2013, it was noted that although he was prescribed Prozac, Plaintiff refused his medication.  (Tr. 515).

On May 1, 2013, it was noted that Plaintiff demonstrated mildly anxious mood and affect.  (Tr. 530).  On May 3, 2013, physical findings were within normal limits, Plaintiff denied experiencing any pain and stated that he wanted to

work.   (Tr. 471, 515).   After the examination, medical restrictions were discontinued for the gym, work, and lower bunk bed.  (Tr. 471).

On May 17, 2013, Plaintiff reported that he saw faces on walls and floors and sometimes heard voices.  (Tr. 531).  It was noted that Plaintiff was alert and oriented x4, presented with an intense mood, normal speech, and preoccupation with death.  (Tr. 531).  In another document dated May 17, 2013, it was noted that Plaintiff's exhibited paranoid and delusional thoughts which included auditory hallucinations.  (Tr. 440-41).  It was noted that Plaintiff's judgement was impaired but insight regarding awareness of his disorder was intact.  (Tr. 441).  He was assessed with psychotic disorder, NOS (possible delusional disorder) and personality disorder, NOS.  (Tr. 441).  Plaintiff was released from prison on May 27, 2013.  (Tr. 520).

During the intake process on November 11, 2013, Plaintiff denied experiencing any depression or suicidal ideation.  (Tr. 536, 548).  He also did not appear overly anxious, panicked, afraid, or angry.  (Tr. 548).  Plaintiff reported a history of pain and use of pain medications.  (Tr. 547).

On January 2, 2014, Plaintiff underwent a psychological evaluation.  (Tr. 550).  Plaintiff reported feeling hopeless and angry, crying all the time, reliving past events, seeing things, and hearing voices.  (Tr. 550).  It was noted that Plaintiff was restless, had a labile affect, tangential thought process and a

depressed, angry, and irritable mood.  (Tr. 550).  It was noted that Plaintiff's thought content included delusions and Plaintiff reported auditory and visual hallucinations.  (Tr. 550).  The examiner noted, however, that Plaintiff was not responding to internal stimuli and that his thoughts and anger were toward the public in general.  (Tr. 550).  The examiner diagnosed Plaintiff with PTSD, intermittent explosive disorder, and personality disorder.  (Tr. 550).  The examiner assessed Plaintiff with a GAF of 40 and recommended a mood stabilizer, i.e., VPA (Valproic Acid), for treatment.  (Tr. 550).

On January 16, 2014, Plaintiff reported that the psychiatric medication kept him out of conflict and made him feel calmer.  (Tr. 549).  It was noted that Plaintiff had an appropriate affect, anxious mood, coherent thought process, normal thought content, and intact memory.  (Tr. 549).  Plaintiff was reported to have occasional auditory hallucinations.  (Tr. 549).  His thought process was coherent and his thought content was normal.  (Tr. 549).  It was noted that he continued to relive his past. (Tr. 549).  Plaintiff's medication dosage was increased.  (Tr. 549).

On January 21, 2014, Plaintiff reported upset stomach.  (Tr. 547).   On January 22, 2014, and January 29, 2014, Plaintiff had a follow-up visits to evaluate for pain.  (Tr. 547).

///

///

### 8. Consultative Examination: Stanley E. Schneider, Ed.D.

On May 24, 2012, Plaintiff underwent a psychological examination by Dr. Schneider. (Tr. 286-295). Dr. Schneider noted that Plaintiff walked with a noticeable limp, but he was able to ambulate without a cane. (Tr. 287). Plaintiff stated that he usually walked with a cane, but was not using a cane on the day of the examination because he did not want to depend on it. (Tr. 287). Plaintiff reported that if he sits for too long his leg feels numb and if he stands too long he loses feeling in his right knee. (Tr. 287). Dr. Schneider observed that Plaintiff stood up to alleviate his symptoms and used another chair to elevate his leg. (Tr. 287, 290). Dr. Schneider noted that Plaintiff talked continuously in a rambling fashion. (Tr. 287, 289). When discussing his work history, Plaintiff stated that he could cook, paint, landscape, and cremate people. (Tr. 287). Plaintiff stated that he had ten jobs in his lifetime, but was fired from all of them because of his anger and arguing with others. (Tr. 288-89). He stated that he did not relate much with coworkers, but was okay with supervisors generally. (Tr. 289). He described a criminal history since age 16 and he was last jailed in 2009. (Tr. 288). Plaintiff reported a history of substance abuse, denied alcohol use, and stated that he used marijuana "every now and then." (Tr. 288). Dr. Schneider noted that Plaintiff had never been hospitalized for psychiatric symptoms but Plaintiff reported that he believed that he received outpatient treatment approximately two years prior from

Children and Family Services.  (Tr. 288).  Although Plaintiff reported that he had another angry personality whom he referenced in the third-person, Dr. Schneider opined that it did not appear to be "any full-blown Dissociative Identity Disorder." (Tr. 289).  When asked about his depression, he said that he feels bad that he is always in pain and reported that he had crying spells.  (Tr. 289).  Dr. Schneider noted that while Plaintiff was taking hydrocodone and an anti-inflammatory to treat his physical symptoms, he was not currently taking any psychotropic medications and was previously on Prozac.  (Tr. 288).

On examination, Plaintiff became dysphoric as he recalled his past.  (Tr. 290).  His mood was depressed and Plaintiff was somewhat paranoid inasmuch as he thought he would get shot or run over.  (Tr. 290).  He reported having sensory experiences that people were touching his head or holding his arms.  (Tr. 290).  He was obsessed about death.  (Tr. 290).  He admitted to recurrent suicidal ideation, but no current intent.  (Tr. 290).  He had no memory deficits and his attention and concentration were good.  (Tr. 291).  He admitted to impulsively losing his temper. (Tr. 291).  His judgment was acceptable, but his insight was limited.  (Tr. 291).

Although opining that Plaintiff was "fairly reliable," Dr. Schneider "strongly suggested that confirmatory data . . . be obtained to support some of the statements" that Plaintiff made concerning what he witnessed in the past.  (Tr. 291).  With regard to daily activities, Dr. Schneider stated that "[t]he only

impairments, restrictions, limitations concerning activities of daily living are mainly physical." (Tr. 291). Dr. Schneider noted that Plaintiff did serial 5's acceptably, was concrete in his attempts to interpret simple proverbs, did not appear to have any significant memory deficits, was able to correctly repeat four digits forward and backward, was able to maintain attention and concentration, his judgment was acceptable, and his insight was limited. (Tr. 292). Plaintiff admitted to helping clean "now and then," and being able to cook. (Tr. 291-92). He knew how to shop and he reported no problems with personal care or hygiene. (Tr. 292). Dr. Schneider stated that socially, Plaintiff tended to be a loner and that his concentration and persistence would vary and his pace was fast. (Tr. 292). Dr. Schneider diagnosed Plaintiff with PTSD, depressive disorder, paranoid disorder with possible psychotic features, marijuana abuse, and possibly a personality disorder with antisocial features. (Tr. 292).

Dr. Schneider assessed Plaintiff as having a marked to extreme limitation in the ability to: 1) respond appropriately to work pressures in a usual work setting; 2) respond appropriately to changes in a routine work setting; and, 3) interact appropriately with the public, supervisors and coworkers. (Tr. 294). Dr. Schneider opined that Plaintiff had a slight limitation in: 1) understanding, remembering, and carrying out short and simple instructions; 2) understanding, remembering, and carrying out detailed instructions, and; 3) making judgments on simple work-

related decisions.  (Tr. 294).  In support of his opinion, Dr. Schneider explained that Plaintiff presented with a long history of loss of temper, anger management problems, and chronic pain impaired his ability to handle work demands.  (Tr. 294).

### 9.    Psychiatric Review Technique: Emanuel Schnepp, Ph.D.

On July 3, 2012, Dr. Schnepp, reviewed the record and opined that Plaintiff's mental impairments did not preclude him from meeting the basic mental demands of competitive work on a sustained basis.  (Tr. 63, 66-67).  Dr. Schnepp opined that Plaintiff did not meet the criteria for Listing 12.04, 12.06, 12.08, or 12.09.  (Tr. 62).  Dr. Schnepp opined that Plaintiff had no repeated episodes of decompensation, each of extended duration, had a mild restriction of activities of daily living, had moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace.  (Tr. 62).  According to Dr. Schnepp, Plaintiff did not have any memory limitations.  (Tr. 65).  Dr. Schnepp opined that Plaintiff was not significantly limited in the ability to: 1) carry out very short and simple instructions as well as detailed instructions; 2) sustain an ordinary routine without special supervision; 3) work in coordination with or in proximity to others without being distracted by them; 4) make simple work-related decisions; 5) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent

pace without an unreasonable number and length of rest periods; 6) ask simple questions or request assistance; and, 7) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  (Tr. 66).  Dr. Schnepp opined that Plaintiff was moderately limited in the ability to: 1) maintain attention and concentration for extended periods; 2) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; 3) interact appropriately with the general public; 4) accept instructions and respond appropriately to criticism from supervisors; and, 5) get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 66).  Dr. Schnepp added:

> [Plaintiff] is able to carry out very short and simple instructions. He can make simple decisions. [Plaintiff] is capable of working within a schedule at a consistent pace for routine and repetitive work. Although somewhat limited in this regard by his [mental health] impairment, the claimant is able to maintain concentration and attention for reasonably extended periods of time when performing routine and repetitive work. He would be able to maintain an ordinary work routine without special supervision.

(Tr. 66).  Dr. Schnepp considered the June 2012 opinion of Dr. Schneider, and opined that Dr. Schneider's opinions about Plaintiff's abilities in the areas of making personal and social adjustments and making occupational adjustments "reveal only a snapshot of his functioning, based on an isolated exam, which is not supported by other evidence, and thus is considered to represent an overestimation of his functional limitations."  (Tr. 67).

### III.   Legal Standards and Plaintiff's Alleged Errors

To receive benefits under the Act, a claimant must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The ALJ uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520. The ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20

C.F.R. §§ 404.1520.  Before step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.  If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that the claimant can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993).  The ultimate burden of proving disability under the Act lies with the claimant.  *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

With due deference to the Commissioner's construction of social security rulings and regulations, the court may reverse the Commissioner's final determination if the ALJ did not properly apply the legal standards.  *See* 42 U.S.C. § 405(g) ("court shall review only the question of conformity with such regulations and the validity of such regulations"); *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166-67 (2012) (deference to agency interpretation of its own regulations); *Sanfilippo v. Barnhart*, 325 F.3d 391, 393 (3d Cir. 2003) (plenary review of legal questions in social security cases); *see also Witkowski v. Colvin*, 999 F. Supp. 2d 764, 772-73 (M.D. Pa. 2014) (citing *Poulos v. Commissioner of Social Security*, 474 F.3d 88, 91 (3d Cir. 2007)).  The court may also reverse the Commissioner when substantial evidence does not support the ALJ's decision.  *See* 42 U.S.C. § 405(g); *see also Johnson v. Commissioner of Social Sec.*, 529 F.3d

198, 200 (3d Cir. 2008); *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir.1986).   Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is "less than a preponderance" and "more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## A. Step Two Non-Severe Impairments

Plaintiff argues that the ALJ erred in finding his neck, back, left leg, and right shoulder pain to be non-severe impairments.  Pl. Brief at 17-19.

Objective medical diagnoses alone are insufficient to establish severity at step two; a claimant must also present evidence that these limitations significantly limited his or her ability to do basic work activities or impaired his or her capacity to cope with the mental demands of working.  *See* 20 C.F.R. §§ 404.1520(c), 416.920(c), 404.1521(a), 416.921(a); *see also Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 144-45 (3d Cir. 2007) ("diagnoses alone are insufficient to establish

their severity at Step Two")[4]; *McCleary v. Colvin*, 187 F. Supp. 3d 497, 543 (M.D. Pa. 2016).   If a claimant has any severe impairment, the evaluation process continues.   20 C.F.R. §§ 404.1520(d)-(g), 416.920(d)-(g).   A failure to find a medical condition severe at step two will not render a decision defective if some other medical condition was found severe at step two and all impairments are considered at step four when setting the residual functional capacity.   *See* 20 C.F.R. §§ 404.1523, 416.923 and 404.1545(a)(2), § 416.945(a)(2); *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005); *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 145 n. 2 (3d Cir. 2007); *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("any error here became harmless when the ALJ reached the proper conclusion that [Plaintiff] could not be denied benefits conclusively at step two and proceeded to the next step"); *see e.g.*, *Faircloth v. Colvin*, No. Civ.A.12-1824, 2013 WL 3354546, at *11 (W.D.Pa.2013); *Shannon v. Astrue*, No. 4:11-CV-00289, 2012 WL 1205816, at *10-11 (M.D. Pa. Apr. 11, 2012); *Bell v. Colvin*, No. 3:12-CV-00634, 2013 WL 6835408, at *8 (M.D. Pa. Dec. 23, 2013).

While Plaintiff periodically reported back, neck, left leg, and shoulder pain, Plaintiff fails to direct the Court to evidence demonstrating how such reports amounts to a significantly limited ability to do basic work activities.   In fact,

---

[4] *See Marracco v. Kuder*, No. CIV. A. 08-713 NLH, 2009 WL 235469, at *3 (D.N.J. Jan. 30, 2009) (discussing the permissibility and value of citing to unpublished cases in the Third Circuit).

during his incarceration in May 2013, physical findings were within normal limits, Plaintiff denied experiencing any pain and stated that he wanted to work in order to have medical restrictions discontinued for work.  (Tr. 471, 515).

The totality of the evidence does not support Plaintiff's allegation of error. On April 27, 2011, while Plaintiff reporting lower back pain, bilateral leg pain, as well as shoulder and neck pain due to a recent auto-pedestrian collision (Tr. 312-16), he was ambulatory, and examination of Plaintiff's neck revealed that it was non-tender and demonstrated a painless range of motion.  (Tr. 313, 315-16).  On August 24, 2011, Plaintiff reported radicular pain from his low back to his right knee.  (Tr. 274).  Plaintiff was fully ambulatory but walked with a decided limp and exhibited positive straight leg raising on the right.  (Tr. 274).

On December 26, 2012, Plaintiff was ambulatory; his back revealed no costovertebral angle ("CVA") tenderness, and no vertebral tenderness; and his neck revealed was non-tender and demonstrated a painless range of motion.  (Tr. 331, 333).  An x-ray of his right knee showed minimal degenerative changes.  (Tr. 336).

On February 26, 2013, Plaintiff denied back pain or injury, denied neck pain, but reported a history of myalgias.  (Tr. 364).  Plaintiff's gait was normal, he had a normal range of motion in his neck, normal range of motion for his back with no costovertebral tenderness, and normal range of motion in the upper and lower

extremities.  (Tr. 365).  On April 25, 2013, Plaintiff reported that joint problems which included bilateral knee surgery in addition to hip pain. (Tr. 435).  Plaintiff's gait was within normal limits and his right knee demonstrated full range of motion with discomfort. (Tr. 439).  Plaintiff demonstrated a positive McMurray's sign and positive left Costovertebral angle tenderness. (Tr. 439).

On June 5, 2013, Plaintiff was ambulatory with a steady gait.  (Tr. 352).  Plaintiff reported that although he had previously been taking Tylenol #3 for his knee pain, he had not been taking pain medication for a period of time. (Tr. 350).  Upon examination, Dr. Bonar noted that Plaintiff's: 1) musculoskeletal examination was unremarkable; 2) neck examination demonstrated a normal range of motion, and; 3) back examination demonstrated costovertebral tenderness on the left. (Tr. 350-51).  Dr. Bonar recommended that Plaintiff could take over-the-counter medications to address pain. (Tr. 351).

Even assuming arguendo that the ALJ erred at step two, such would be harmless.  While the undersigned has relied on *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005) in previous Social Security disability cases filed by Plaintiff's attorney regarding step two non-severe impairments, Plaintiff's counsel has failed to address this relevant Third Circuit precedent.[5]  *See Pleacher v. Colvin*,

---

[5] Counsel is cautioned in future briefs and objections to be mindful that "'[a] lawyer *shall not knowingly* . . . fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client....'"  *United States v. Garrett*, 504

No. 1:13-CV-02756-GBC, 2015 WL 1470662, at *7 (M.D. Pa. Mar. 31, 2015); *Cleland v. Colvin*, No. 3:14-cv-1235 (M.D. Pa. Sept. 15, 2015) (detailing relevant authority regarding allegations of step two error and concluding that a claimant must still establish harmless error); *see also Palmer v. Colvin*, No. 1:15-cv-00704, 2016 WL 5817240, at *8-9 (M.D. Pa. Aug. 25, 2016), *report and recommendation adopted*, No. 1:15-CV-704, 2016 WL 5787354 (M.D. Pa. Oct. 4, 2016) (highlighting previous recommendations and orders citing relevant Third Circuit precedent regarding step two argument that were issued before and after Plaintiff's February 2016 brief in this case).  Plaintiff's step two (non-severe) argument falls short of the Third Circuit requirement that Plaintiff bears the burden of overcoming the harmless error hurtle.  *See Woodson v. Comm'r Soc. Sec.*, 661 F. App'x 762, 766 (3d Cir. 2016) (citing *Shinseki v. Sanders*, 556 U.S. 396, 409-10 (2009).  This is especially pertinent where no Third Circuit case has found reversible step two error when the ALJ has reached step four of the sequential process.  *Compare Rutherford v. Barnhart*, 399 F.3d 546, 553-55 (3d Cir. 2005) (finding step two error harmless when ALJ reached step four) *with McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004) (finding reversible error where ALJ denied

---

Fed. Appx. 132, 135 n.1 (3d Cir. 2012) (citing Pa. Rule of Prof. Conduct 3.3(a)(2)) (emphasis added); *see also In re Terry*, No. BR 13-14780-MDC, 2015 WL 1321486, at *5 (Bankr. E.D. Pa. Mar. 13, 2015); Hon. Elaine Bucklo, *The Temptation Not to Disclose Adverse Authority*, Litigation, Winter 2014, at 26 (discussing obligation in citing unfavorable but not precedential cases that addressed the exact legal argument previously presented by attorney).

benefits at step two) *and Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546-47 & n. 5 (3d Cir. 2003) (finding reversible error where ALJ denied benefits at step two).

In this instance, the Court is addressing an allegation of a step two error where the ALJ proceeded through the sequential processes to step four. Such a fact pattern is distinguishable from that where the ALJ denies benefits at step two and does not proceed further in the sequential process. *See Brown v. Colvin*, No. 4:15-CV-00992, 2016 WL 6661183, at *14-15 (M.D. Pa. Aug. 25, 2016), *report and recommendation adopted*, No. 4:15-CV-00992, 2016 WL 6652360 (M.D. Pa. Nov. 10, 2016) (concluding step two error was harmless because it did not affect the ultimate outcome of the case, and that "close scrutiny is only required when there is a denial of benefits at step two"); *compare Rutherford v. Barnhart*, 399 F.3d 546, 553-55 (3d Cir. 2005) *with McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004) *and Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546-47 & n. 5 (3d Cir. 2003). The Third Circuit has addressed how to evaluate step two errors when the claim proceeds to step four. *See Rutherford v. Barnhart*, 399 F.3d 546, 552-53 (3d Cir.2005). This is distinguished from the facts in *McCrea* and *Newell* where an ALJ denied benefits at step two without proceeding to step four. *See McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004); *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546-47 & n. 5 (3d Cir. 2003). *But see, Striplin v. Colvin*, No. 3:15-CV-330, 2016 WL 5871086, at *5 (M.D. Pa. Oct. 7, 2016)

(citing to *McCrea* for a step two remand of a decision where the ALJ proceeded through step four). *McCrea* and *Newell* stand for the position that because the "step-two inquiry is a *de minimis* screening device to dispose of groundless claims," any doubt should be resolved in favor of Plaintiff for the purpose of proceeding to subsequent steps. *See McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004) ("Any doubt as to whether [a step two] showing has been made is to be resolved in favor of the applicant"); *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546-47 & n. 5 (3d Cir. 2003) (reversing a step two denial and quoting SSR 85-28, stating that "[i]f an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation process should not end with the not severe evaluation step. Rather, it should be continued").[6]  Reasonable

---

[6] *Newell* cited to *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) which determined that a step two error necessitated reversal notwithstanding the fact that the ALJ proceeded to step five, finding "the ALJ necessarily failed to consider at step five how the combination of her [step two non-severe] impairments . . . affected her residual functional capacity to perform work." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996).  The Court notes that at subsequent steps, the ALJ must consider the combined effect of a claimant's severe and non-sever impairments.  42 U.S.C. § 423(d)(2)(B) ("[T]he Commissioner of Social Security shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity").  Ruling 85-28 states:

> Although an impairment is not severe if it has no more than a minimal effect on an individual's physical or mental ability(ies) to do basic work activities, the possibility of several such impairments combining to produce a severe impairment must be considered. . . . the adjudicator must assess the impact of the combination of those impairments on the person's ability to function, rather than assess separately the contribution of each impairment to the restriction of his or her activity as if each impairment existed alone. A claim may be denied at step two only if the evidence shows that the individual's impairments, when

doubt is in favor of continuing the evaluation process, and where the ALJ has continued the evaluation process, this reasonable doubt does not apply.  *See supra*.

In *Rutherford*, the Court held that any error in evaluating an impairment as non-severe at step two was harmless because "[the claimant] has not specified how that factor would affect the five-step analysis undertaken by the ALJ . . . . [and a] generalized response is not enough to require a remand."  *Rutherford*, 399 F.3d at 553.  Plaintiff has not demonstrated that the ALJ failed to consider credibly established non-severe impairments at steps four and five.  If an ALJ errs in a step two non-severe determination, Plaintiff must establish prejudicial error.  *See Woodson v. Comm'r Soc. Sec.*, 661 F. App'x 762, 766 (3d Cir. 2016) (citing *Shinseki v. Sanders*, 556 U.S. 396, 409-10 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."); *Holloman v. Comm'r Soc. Sec.*, 639 F. App'x 810 (3d Cir. 2016); *see also Rutherford v. Barnhart*, 399 F.3d 546, 553-55 (3d Cir. 2005) ( "[A] remand is not required here because it would not affect the outcome of the case").

Substantial evidence supports the ALJ's determination that back, neck, left leg, and shoulder pain were non-severe impairments.  Even if the ALJ erred, such

---

considered in combination, are not medically severe, i.e., do not have more than a minimal effect on the person's physical or mental ability(ies) to perform basic work activities. If such a finding is not clearly established by medical evidence, however, adjudication must continue through the sequential evaluation process. SSR 85-28.

finding is harmless given the ALJ's consideration of all credibly established impairments at steps four and five.

## B. Plaintiff's Credibility

Plaintiff asserts that the ALJ erred in his assessment of Plaintiff's credibility with regard to Plaintiff's physical limitations.  Pl. Brief at 36-38.

Where a medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms, however, the severity of which is not substantiated by objective medical evidence, the ALJ must make a credibility finding on the claimant's subjective statements. SSR 96-7p.  Great weight is given to a claimant's subjective testimony only when it is supported by competent medical evidence.  *Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir. 1979); accord *Snedeker v. Comm'r of Soc. Sec.*, 244 F. App'x 470, 474 (3d Cir. 2007).  The credibility finding must be based on a consideration of the entire case record, considering several factors in totality. SSR 96-7p; 20 C.F.R. §§ 404.1529, 416.929; *accord Weidman v. Colvin*, No. 3:14-CV-0552-MEM-GBC, 2015 WL 6673830, at *24-33 (M.D.Pa. Aug. 7, 2015) report and recommendation adopted, No. CV 3:14-552, 2015 WL 5829788 (M.D.Pa. Sept. 30, 2015).  There is a distinction between what an adjudicator must "consider" and what the adjudicator must explain in the disability determination.  *See* SSR 06-03p (explaining that to "consider" means to provide explanation sufficient for a

"subsequent reviewer to follow the adjudicator's reasoning"); *Phillips v. Barnhart*, 91 F. App'x 775, 780 n. 7 (3d Cir. 2004); *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) (social security regulations enumerating factors of an ALJ to consider "require only that the ALJ's decision include 'good reasons' . . . not an exhaustive factor-by-factor analysis").

Plaintiff does not address the totality of the medical evidence. The ALJ extensively discussed the material evidence throughout his decision. (Tr. 16, 20-24) and although all of the relevant evidence was not repeated in a specific credibility section, such is not required. *See Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (ALJ is not required to "use particular language or adhere to a particular format in conducting his analysis"); *see also Phillips v. Barnhart*, 91 F. App'x 775, 780 n. 7 (3d Cir. 2004); *Maxwell v. Colvin*, 1:13-CV-2410, 2015 WL 3409055, at *6-7 (M.D. Pa. May 27, 2015). The ALJ addressed the objective medical evidence, including the x-rays and MRIs, as well as other evidence, such as Plaintiff's statements to physicians about his pain, physicians' observations of Plaintiff's gait, the type, frequency, and intensity of treatment and pain medication that Plaintiff received, statements by Plaintiff's physicians regarding Plaintiff's improvement, and observations of full or nearly-full range of motion throughout Plaintiff's joints. (Tr. 16, 20-24, 26). The ALJ noted in the record from May 2013, due to Plaintiff's representations, prison medical staff removed Plaintiff

from medical restrictions for the gym.  (Tr. 21 (citing to (Tr. 471)).  The ALJ noted

that during the consultative examination in May 2012, although Plaintiff walked

with a noticeable limp, he was still able to ambulate without a cane or assistance

and Plaintiff stated that although he usually walked with a cane, he was not using a

cane on that date because he did not want to depend on it.  (Tr. 21 (citing to Tr.

287)).  While Plaintiff directs the Court to two instances where Plaintiff asserted

that he uses a cane (Tr. 200, 287), Plaintiff does not direct the Court to any

evidence in the medical record with medical professionals referring to the use of a

cane or any ambulatory assistive device.  There is no mention of the need of any

ambulatory device in his medical records from incarceration.

Based on the foregoing, substantial evidence supports the ALJ's credibility

determination.  *See* SSR 96-7p; 20 C.F.R. §§ 404.1529, 416.929.

### C. Weight Accorded to Medical Opinions

Plaintiff argues that the ALJ erred in the allocation of weight to the medical

opinions.  Pl. Brief at 29-35.  Specifically, Plaintiff argues that the ALJ accorded

too little weight to Dr. DeMuth's opinion on February 27, 2012, wherein he stated

that Plaintiff was unable to work until his knee symptoms resolve.  Pl. Brief at 29-

30 (citing Tr. 268).  According to Plaintiff, Dr. Demuth's February 2012 opinion

should have been accorded significant weight.  (Tr. 31).  Plaintiff argues that the

ALJ erred in assigning greater weight to Dr. Schnepp's July 2012 opinion over that of Dr. Schneider's May 2012 consultative opinion.  (Tr. 31-34).[7]

For weighing all medical opinions, the Commissioner considers the factors enumerated in 20 C.F.R. §§ 404.1527(c), 416.927(c).  Pursuant to subsection (c)(3), "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion" and "[t]he better an explanation a source provides for an opinion, the more weight we will give that opinion."  Pursuant to subsection (c)(4), "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."  Pursuant to subsection (c)(5), more weight may be assigned to specialists, and subsection (c)(6) allows consideration of other factors which "tend to support or contradict the opinion."   20 C.F.R. §§ 404.1527(c), 416.927(c).

Substantial evidence supports the ALJ's allocation of little weight to Dr. DeMuth's opinion on February 27, 2012.  The opinion was conclusory and without

---

[7] Plaintiff also argues that the ALJ erred in the weight allocated to Plaintiff's GAF scores because, the Diagnostic and Statistical Manual of Mental Disorders ("DSM-5") no longer uses the GAF scale as of 2013.  (Tr. 35).  The Court finds such argument unpersuasive given that a portion of the medical records were generated prior to the changes reflected in the DSM-5. Moreover, the ALJ is required to evaluate all medical opinions, which include GAF scores.  *See Brennan v. Colvin*, No. 4:15-CV-01176, 2016 WL 7107235, at *7 (M.D. Pa. Sept. 14, 2016), *report and recommendation adopted*, No. 4:15-CV-1176, 2016 WL 7049029 (M.D. Pa. Dec. 5, 2016).  Moreover, Plaintiff cites to no precedence mandating that an ALJ should ignore the GAF scores that the medical providers assessed nor does Plaintiff direct the court to any precedence that the ALJ's consideration of GAF scores amounts to reversible error.

any explanation of what type of work Plaintiff would be unable to do, and did not delineate any specific functional limitations besides Plaintiff's knee.  The opinion did not specify that the prohibition from work would last beyond twelve months in keeping with the durational requirement (42 U.S.C. § 423(d)(1)(A) and 20 C.F.R. § 404.1509 which require that the medically determinable impairment "has lasted or can be expected to last for a continuous period of not less than 12 months"). Moreover, in light of the totality of the evidence, the ALJ correctly observed that Plaintiff's condition improved, and Plaintiff requested to have any medical prohibitions removed from his ability to work while incarcerated.  (Tr. 26, 471).

Substantial evidence supports the ALJ's reliance on Dr. Schnepp's July 2012 opinion and according less weight to Dr. Schneider's May 2012 consultative opinion.  It was reasonable for the ALJ to rely on Dr. Schnepp's July 2012 opinion which found that Dr. Schneider's opinion about Plaintiff's abilities in the areas of making personal and social adjustments and making occupational adjustments "reveal only a snapshot of his functioning, based on an isolated exam, which is not supported by other evidence, and thus is considered to represent an overestimation of his functional limitations."   (Tr. 67); *see* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i) (state agency physicians are "highly qualified" and "experts" in social security disability evaluation.); 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical

and other evidence of the existence thereof"); 42 U.S.C.A. § 421 (h) (a disability determination shall not be made until every reasonable effort has been made "in any case where there is evidence which indicates the existence of a mental impairment, that a qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable residual functional capacity assessment"); 42 U.S.C.A. § 1382c(a)(3)(H)(i).

Rather than citing evidence from medical records which would reflect a longitudinal history, Dr. Schneider explained that his opinion was based upon Plaintiff's subjective representation of his history. (Tr. 294). When a medical opinion is based on subjective, rather than objective, information, and the ALJ has properly found a claimant's subjective claims to be less than fully credible, an ALJ may assign less weight to the opinion:

> [T]he mere memorialization of a claimant's subjective statements in a medical report does not elevate those statements to a medical opinion. An ALJ may discredit a physician's opinion on disability that was premised largely on the claimant's own accounts of her symptoms and limitations when the claimant's complaints are properly discounted.

*Morris v. Barnhart*, 78 Fed. Appx. 820, 824-25 (3d Cir. 2003) (some internal citations omitted). In this instance, the ALJ explained that Plaintiff was not entirely credible regarding the extent and severity of his impairments and limitations and explained how Plaintiff's allegations of disabling limitations were not consistent with the totality of the evidence which includes the limited degree of

treatment he received and the observations made by medical professionals.   (Tr. 18, 22-23).

The ALJ observed that the extreme limitations set forth in Dr. Schneider's opinion were inconsistent with the evidence which included the lack of significant psychiatric hospitalization, the refusal of psychotropic drugs when incarcerated, and the lack of treatment despite allegations of lengthy and significant mental health symptomatology.   (Tr. 26).   The ALJ's consideration of Plaintiff's conservative treating is a proper ground for finding Plaintiff's allegations less credible.   *See* Social Security Ruling ("SSR") 96-7p ("the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints . . . and there are no good reasons for this failure)."   His mental health treatment was sporadic and Plaintiff fails to establish "good reasons for this failure" to consistently pursue mental health treatment.

Plaintiff had a mental health evaluation on December 13, 2010, at a time when he was not currently being treated of taking any psychotropic medication.   (Tr. 339).   Dr. Saracino assessed Plaintiff with a GAF score of 55, prescribed a trial of Prozac 20mg, recommended that Plaintiff abstain from drug use, and recommended individual therapy.   (Tr. 342).   On March 1, 2011, Plaintiff was discharged from Pressley Ridge for refusal to comply with attendance requirements.   (Tr. 410-412).   During incarceration, on June 18, 2012, Plaintiff

reported "seeing" the people that he cremated during his prior employment. (Tr. 499, 529). In records on June 15, 2012, June 18, 2012, April 25, 2013, and May 17, 2013, Plaintiff generally was alert and oriented x3 and exhibited no signs of depression. (Tr. 413-16, 428). Plaintiff reported that he had PTSD and would need to see a psychologist. (Tr. 420, 433). On October 19, 2012, Dr. DeMuth noted that Plaintiff seemed a "bit hyperactive" and did not appear to be as depressed as he had been on previous visits. (Tr. 386). On November 7, 2012, Plaintiff presented with a minimal risk for suicide. (Tr. 372-73). On February 26, 2013, Plaintiff denied a history of anxiety or depression and Dr. Benaknin noted that Plaintiff had a normal affect and judgment. (Tr. 364-65). On March 28, 2013, when discussing his medications, Plaintiff mentioned pain medication and did not mention any psychotropic medications. (Tr. 358). Dr. Hildrew observed that was anxious and alleged suicidal ideation and auditory hallucinations, however, Plaintiff presented as a minimal suicide risk. (Tr. 358).

During incarceration, on April 26, 2013, it was noted that Plaintiff had no mental health restrictions and he refused to take the prescribed Prozac because he did not like the way it made him feel. (Tr. 530). During the examination, Plaintiff denied suicidal thoughts, denied hallucinations, and presented with appropriate conversation, normal speech, and euthymic mood. (Tr. 530). On April 29, 2013, it was noted that although he was prescribed Prozac, Plaintiff refused his medication.

(Tr. 515).   During incarceration, on May 1, 2013, it was noted that Plaintiff demonstrated mildly anxious mood and affect.  (Tr. 530).   On May 17, 2013, Plaintiff reported that he saw faces on walls and floors and sometimes heard voices.  (Tr. 531).   It was noted that Plaintiff was alert and oriented x4, presented with an intense mood, normal speech, and preoccupation with death.  (Tr. 531). On the same day it was noted that Plaintiff exhibited paranoid and delusional thoughts which included auditory hallucinations.  (Tr. 440-41).   It was noted that Plaintiff's judgement was impaired but insight regarding awareness of his disorder was intact.   (Tr. 441).   He was assessed with psychotic disorder, NOS (possible delusional disorder) and personality disorder, NOS.   (Tr. 441).   Plaintiff was released from prison on May 27, 2013.  (Tr. 520).

On June 5, 2013, Plaintiff reported that he smoked marijuana and Dr. Bonar noted that Plaintiff's psychiatric examination revealed normal affect and judgement.  (Tr. 350-51).  On November 5, 2013, Plaintiff reported to his therapist that he would like to stop seeing the images of dead people.  (Tr. 408).  Plaintiff was diagnosed with dysthymic disorder and assessed with a GAF score of 50.  (Tr. 408).  On November 12, 2013, he was discharged from treatment due to his return to jail.  (Tr. 406-07).  He was assessed with a GAF score of 50 and it was noted that minimal progress was made towards reaching the treatment goals.  (Tr. 406).

During the incarceration intake process on November 11, 2013, Plaintiff denied experiencing any depression or suicidal ideation. (Tr. 536, 548). He also did not appear overly anxious, panicked, afraid, or angry. (Tr. 548). During incarceration on January 2, 2014, Plaintiff underwent a psychological evaluation. (Tr. 550). Plaintiff reported feeling hopeless and angry, crying all the time, reliving past events, seeing things, and hearing voices. (Tr. 550). It was noted that Plaintiff was restless, had a labile affect, tangential thought process and a depressed, angry, and irritable mood. (Tr. 550). It was noted that Plaintiff's thought content included delusions and that Plaintiff reported auditory and visual hallucinations. (Tr. 550). The examiner noted, however, that Plaintiff was not responding to internal stimuli and that his thoughts and anger were toward the public in general. (Tr. 550). The examiner diagnosed Plaintiff with PTSD, intermittent explosive disorder, and personality disorder. (Tr. 550). The examiner assessed Plaintiff with a GAF of 40 and recommended a mood stabilizer, i.e., VPA (Valproic Acid), for treatment. (Tr. 550). During incarceration on January 16, 2014, Plaintiff reported that the psychiatric medication kept him out of conflict and made him feel calmer. (Tr. 549). It was noted that Plaintiff had an appropriate affect, anxious mood, coherent thought process, normal thought content, and intact memory. (Tr. 549). Plaintiff was reported to have occasional auditory hallucinations. (Tr. 549). His thought process was coherent and his thought

content was normal.  (Tr. 549).  It was noted that he continued to relive his past. (Tr. 549).  Plaintiff's medication dosage was increased.  (Tr. 549).

The ALJ also summarized Plaintiff's ability to engage in activities of daily living as well as routine social interaction.  (Tr. 24-25).  Based on the foregoing, substantial evidence supports the ALJ's allocation greater weight to Dr. Schnepp's July 2012 opinion over that of Dr. Schneider's May 2012 consultative opinion.

### D. Listing 12.04

Plaintiff argues that the ALJ erred in concluding that Plaintiff's impairments did not meet the requirements of Paragraphs A and B for Listing 12.04.  Pl. Brief at 19-23.

The Secretary explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard.  *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990).  "The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.'" *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990); *see also* 20 CFR § 416.925(a) (1989) (purpose of listings is to describe impairments "severe enough to prevent a person from doing any gainful activity").  "The reason for this difference between the listings' level of severity and the statutory standard is that, for adults, the listings were designed to operate as a presumption of disability that makes further inquiry

unnecessary." *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990).   A claimant must

establish each element of a Listing to meet a Listing.   20 C.F.R. § 404.1525(d)

("To meet the requirements of a listing, you must have a medically determinable

impairment(s) that satisfies *all of the criteria in the listing*.") (emphasis added).   As

the Third Circuit has explained:

> For a claimant to show that his impairment matches a listing, it must
> meet *all* of the specified medical criteria. An impairment that
> manifests only some of those criteria, no matter how severely, does
> not qualify." *Zebley*, 110 S.Ct. at 891 (emphasis in original). "For a
> claimant to qualify for benefits by showing that his unlisted
> impairment, or combination of impairments, is 'equivalent' to a listed
> impairment, he must present medical findings equal in severity to *all*
> the criteria for the one most similar listed impairment." *Id.* (emphasis
> in original).

*Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir. 1992). Thus, if there is one

element that is not satisfied, the ALJ will have substantial evidence to conclude

that a claimant does not meet a Listing.  *See Williams v. Sullivan*, 970 F.2d 1178,

1186.

Listing 12.04 requires:

12.04 Affective Disorders: Characterized by a disturbance of mood,
accompanied by a full or partial manic or depressive syndrome.
Mood refers to a prolonged emotion that colors the whole psychic
life; it generally involves either depression or elation.
The required level of severity for these disorders is met when the
requirements in both A and B are satisfied, or when the requirements
in C are satisfied.
A. Medically documented persistence, either continuous or intermittent, of
one of the following:
1. Depressive syndrome characterized by at least four of the following:

a. Anhedonia or pervasive loss of interest in almost all activities; or
b. Appetite disturbance with change in weight; or
c. Sleep disturbance; or
d. Psychomotor agitation or retardation; or
e. Decreased energy; or
f. Feelings of guilt or worthlessness; or
g. Difficulty concentrating or thinking; or
h. Thoughts of suicide; or
i. Hallucinations, delusions, or paranoid thinking; or
2. Manic syndrome characterized by at least three of the following:
a. Hyperactivity; or
b. Pressure of speech; or
c. Flight of ideas; or
d. Inflated self-esteem; or
e. Decreased need for sleep; or
f. Easy distractibility; or
g. Involvement in activities that have a high probability of painful consequences
which are not recognized; or
h. Hallucinations, delusions or paranoid thinking;
or
3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B. Resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration;

20 C.F.R. § Pt. 404, Subpt. P, App. 1 (version effective from February 26, 2014 to

December 8, 2014).

Plaintiff does not meet Paragraph B for listing 12.04.  Plaintiff argues that he

"has shown marked restrictions of activities of daily living . . . ."  Pl. Brief at 22-

23.  However, in Dr. Schneider's May 2012 opinion, he concluded that with regard to daily activities, "[t]he only impairments, restrictions, limitations concerning activities of daily living are mainly physical."  (Tr. 291).  Dr. Schneider opined that Plaintiff had no memory deficits and his attention and concentration were good.  (Tr. 291).  Dr. Schneider gave no opinion regarding whether Plaintiff met the requirements of Listing 12.04, and whether there were any periods of decompensation.[8]

In Dr. Schnepp's July 2012 opinion, he concluded that Plaintiff's mental impairments did not preclude him from meeting the basic mental demands of competitive work on a sustained basis.  (Tr. 63, 66-67).  Dr. Schnepp opined that Plaintiff did not meet the criteria for Listing 12.04, 12.06, 12.08, or 12.09.  (Tr. 62).   Dr. Schnepp opined that Plaintiff had no repeated episodes of decompensation, each of extended duration, had a mild restriction of activities of daily living, had moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace.  (Tr. 62). Dr. Schnepp considered that June 2012 opinion of Dr. Schneider, and opined that Dr. Schneider's opinions about Plaintiff's abilities in the areas of making personal and social adjustments and making occupational adjustments "reveal only a snapshot of his functioning, based on an isolated exam, which is not supported by

---

[8] Plaintiff does not assert that he has experienced any episodes of decompensation.

other evidence, and thus is considered to represent an overestimation of his functional limitations." (Tr. 67). Given that not all of the elements of Listing 12.04 have been satisfied, substantial evidence supports the ALJ's determination that Plaintiff does not meet the Listing. *See Williams v. Sullivan*, 970 F.2d 1178, 1186.

### E. Residual Functional Capacity

Plaintiff argues that the ALJ's RFC of light work with a stand and sit at will option is erroneous due to the vagueness of the limitation and Plaintiff's inability to stand and walk for long periods of time. Pl. Brief at 24-27. Plaintiff also argues that Plaintiff's psychological impairments preclude him from meeting the basic mental demands of unskilled work and argues that the ALJ should have adopted Dr. Schneider's opinion regarding Plaintiff's marked and extreme limitations. Pl. Brief at 27-29. The ALJ determined that Plaintiff could:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except with a sit/stand option at will. The claimant must have no exposure to hazards such as unprotected heights or dangerous equipment. [Plaintiff] retains the mental capacity to perform simple, routine, repetitive tasks with a GED of 1, 1, 1 and to have occasional interaction with coworkers and supervisors, but no public contact, with "occasional" being defined as up to one-third (1/3) of the workday.

(Tr. 19).

The final responsibility for deciding a claimant's residual functional capacity is an issue reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d)(2),

416.927(d)(2).   Administrative law judges determine a claimant's residual functional capacity based on all of the relevant medical and other evidence and are not bound by any findings made by State agency medical or psychological consultants.   *See* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i); 20 C.F.R. §§ 404.1545(a), 416.945(a); *see also Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006) ("There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC"); *Carl v. Colvin*, No. 3:15-CV-00895-GBC, 2016 WL 2736079, at *8 (M.D. Pa. May 11, 2016).   Substantial evidence supports the ALJ's allocation of greatest weight to the July 2012 opinion of Dr. Schnepp which concluded that Plaintiff's mental impairments did not preclude him from meeting the basic mental demands of competitive work on a sustained basis.   (Tr. 63, 66-67).   It was reasonable for the ALJ to rely on Dr. Schnepp's opinion in formulating the RFC with regard to psychological impairments.

As discussed above, substantial evidence supports the ALJ's credibility determination regarding the severity of Plaintiff's physical impairments and the ALJ's step two determination.   The ALJ considered the evidence in totality and adequately explained the reasoning for the allocation of weight to the medical opinions.   The ALJ noted where in the record Plaintiff was ambulatory, not taking pain medication for his knee, demonstrated full range of motion in the extremities,

and did not use assistive devices. (Tr. 16, 20-24, 26 (ALJ decision); (Tr. 274, 287 (Plaintiff explaining that he was not using a cane because he did not want to depend on it), 313, 315-16, 331, 333, 336, 350-52, 364-65, 439, 471 (Plaintiff asserting that there was no need to place medical restrictions on his ability to work, have an upper bunk, or use the gym while incarcerated). Plaintiff does not direct the Court to any evidence where medical professionals mention the use of a cane or any ambulatory assistive device. Substantial evidence supports the ALJ's RFC and how the RFC reflects Plaintiff's ability to sit, stand and walk.

The Court in unpersuaded by Plaintiff's argument that the RFC of light work with the exception of alternating between sitting or standing at will is too vague and contradicts light work. Courts have upheld decisions with substantively similar RFC requirements. *See e.g.*, *Orndorff v. Colvin*, No. 1:14-CV-2465, 2016 WL 1450172 (M.D. Pa. Apr. 13, 2016). "'[A]t will' constitutes a clear direction that it is for the Plaintiff to determine when and for how long she sits or stands." *Nicholson v. Colvin*, No. 3:14 CV-1819, 2015 WL 1275365, at *10 (M.D. Pa. Mar. 19, 2015)[9]; *Torres v. Colvin*, No. 3:14-cv-00144 (M.D. Pa. Oct. 30, 2015). A requirement to sit or stand at will constitute "shorthand language in matters about which the ALJ and [vocational expert] are well versed." *Minichino v. Colvin*, 955

---

[9] Plaintiff's attorney previously raised this argument which was rejected in *Nicholson v. Colvin*, No. 3:14 CV–1819, 2015 WL 1275365, at *10 (M.D. Pa. Mar. 19, 2015). However, Plaintiff's February 2016 brief fails to cite this previous case. *See supra* note 5.

F.Supp.2d 366, 381 (M.D. Pa. 2013) (Conaboy, J.); *see also Joyce v. Comm'r of Soc. Sec.*, No. CIV. 11-6441 NLH, 2012 WL 6707737, at *5 (D.N.J. Dec. 26, 2012).   With similar facts to this instant case, the Court in *Joyce* explained that where a vocational specialist was asked to consider all of Plaintiff's limitations which included a need to sit and stand at will, "any lack of specificity as to the frequency of sitting or standing is immaterial, as the worker's ability to sit and stand at will while performing these jobs allows the worker to choose for herself the frequency that corresponds to her own needs."  *Joyce v. Comm'r of Soc. Sec.*, No. CIV. 11-6441 NLH, 2012 WL 6707737, at *5 (D.N.J. Dec. 26, 2012) (citing *Barnes v. Astrue*, 2011 WL 6371005, *4 (M.D.N.C. Dec. 20, 2011).[10]

The RFC is not requiring Plaintiff to do a "full range of light work," rather it is "light work" with exceptions.  The Third Circuit in *Boone v. Barnhart*, observed:

> SSR 83-12 makes clear that if a person "must alternate periods of sitting and standing," . . . she "is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work (and for the relatively few light jobs which are performed

---

[10] The Court in *Barnes* reasoned that:

> even if the Court found SSR 83–12 required the ALJ to specify the frequency of Plaintiff's need to sit and stand, the ALJ's finding that Plaintiff requires a "sit/stand option" would be adequate. A residual functional capacity that states a claimant requires the option to sit or stand "clearly contemplate[s]" that the claimant requires the option to sit or stand at will during the work day. Because the ALJ included in his hypothetical question to the vocational expert the limitation that Plaintiff required a sit/stand option, it is also reasonable to find that the vocational expert understood that the sit/stand option meant that Plaintiff could sit or stand whenever she wanted.

*Barnes v. Astrue*, No. 1:09-CV-553, 2011 WL 6371005, at *4 (M.D.N.C. Dec. 20, 2011), *report and recommendation adopted,* No. 1:09-CV-553, 2012 WL 601845 (M.D.N.C. Feb. 23, 2012) (internal citations omitted).

> primarily in a seated position) or the prolonged standing or walking
> contemplated for most light work." *Id.* Thus, the requirement, found
> by the ALJ, that [the plaintiff's] employment allow her the option to
> sit or stand at will every thirty minutes precludes her from performing
> "the prolonged sitting contemplated in the definition of sedentary
> work" as well as "most light work." *Id.*

*Boone v. Barnhart*, 353 F.3d 203, 210 (3d Cir. 2003), *as amended* (Dec. 18, 2003).

Generally, given that the Dictionary of Occupational Titles ("DOT") does not

include sit/stand options in job descriptions, it is not an error for an ALJ to fail to

inquire whether there is an explicit conflict between the VE's testimony and the

DOT. *See Sanborn v. Comm'r of Soc. Sec.*, 14-4103, 2015 WL 3452872, at *6 (3d

Cir. June 1, 2015). The key inquiry is whether the ALJ sufficiently inquired the

Vocational Expert ("VE") to ascertain whether there were a significant number of

jobs in the economy that the claimant can perform *and* whether there were findings

concerning the erosion of the occupational base. *See Boone v. Barnhart*, 353 F.3d

203, 210 (3d Cir. 2003), *as amended* (Dec. 18, 2003).

In this instance, the ALJ specified to the VE to account for a sit and stand at

will limitation in the hypothetical. (Tr. 53). According to the VE's testimony, an

individual with Plaintiff's RFC would be capable of working as a bakery worker

(DICOT 524.687-022), machine tender (DICOT 569.686-046, and produce

weigher (DICOT 299.687-010. (Tr. 54). The VE explained that while the

"sit/stand" option is not in the DOT, it is "observed by vocational counselors as we

read job descriptions of simple, repetitive work that is performed in one place. And

**Page 50 of 56**

then we look at those jobs that can be performed sitting or standing without changing the rate of production, and we see them in everyday life." (Tr. 54).

The Court finds that the VE's explanation that her testimony regarding the sit/stand option was based upon personal experience and observations is a sufficient explanation for the ALJ to rely upon. *See Garavaglia v. Colvin*, No. 1:14-CV-02464, 2015 WL 8935153, at *6 (M.D. Pa. Nov. 9, 2015), *report and recommendation adopted*, No. 1:14-CV-2464, 2015 WL 8781342 (M.D. Pa. Dec. 15, 2015) (finding that "the ALJ did not err in relying on the VE's 'knowledge, experience, and observations' as well as the VE's reduction in the number of positions based on the 'conflict' of the DOT not addressing a sit/stand at will limitation"); *Minichino v. Colvin*, 955 F.Supp.2d 366, 380-81 (M.D. Pa. 2013). The ALJ "received the assistance of a VE in considering the more precise question of whether there are a significant number of jobs in the economy that the claimant can perform" and about "the erosion of the occupational base" due to the "sit/stand" option which amounts to substantial evidence to support the RFC. *See Boone v. Barnhart*, 353 F.3d 203, 210 (3d Cir. 2003), *as amended* (Dec. 18, 2003); (Tr. 27, 64-65).

Based on the above discussion, the Court finds that substantial evidence supports the ALJ's RFC determination. The ALJ reviewed all of the relevant evidence and provided a clear explanation of the reasons for his determination, the

RFC was supported by medical evidence, and the RFC sufficiently addressed Plaintiff's limitations.  *See Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004); Fargnoli, 247 F.3d at 41 (3d Cir. 2001).

## F.  Step Five

As noted above, Plaintiff's challenge to the ALJ's compliance with SSR 00-4p relates to the sit/stand option included in the RFC and presented to the VE in the ALJ's hypothetical.  Plaintiff argues that because the sit/stand option is not referenced in the DOT, there is a conflict that the ALJ failed to address.  Pl. Brief at 38-40.

If the claimant satisfies the burden at steps one through four, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *See Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir.1993).  However, the ultimate burden of proving disability within the meaning of the Act still lies with the plaintiff.  *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).  At step five, it is the Commissioner's burden to prove that there are jobs in the national economy that the Plaintiff can perform, given the impairments accepted by the ALJ.  *See Sykes v. Apfel*, 228 F.3d 259, 266 (3d Cir. 2000).  If work a claimant can do "exists in the national economy"—that is, if "there is a significant number of jobs (in one or more occupations) having requirements which [the claimant is] able

to meet with [his] physical or mental abilities and vocational qualifications"—the claimant will not be considered disabled.  *See* 20 C.F.R. § 404.1566(b); *see also Craigie v. Bowen*, 835 F.2d 56, 58 (3d Cir. 1987) (holding that 200 jobs in regional economy "is a clear indication that there exists in the national economy other substantial gainful work which [claimant] can perform."); *accord Russo v. Comm'r of Soc. Sec.*, No. CIV.A. 13-06918 FLW, 2014 WL 6991987, at *11 (D.N.J. Dec. 10, 2014).

In this instance, the VE testimony provides substantial evidence regarding the availability of jobs with a sit/stand option.  *See Sanborn v. Colvin*, No. 13-224, 2014 WL 3900878, at *18 (E.D. Pa. Aug. 11, 2014); *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987) (holding that the testimony of a VE constitutes substantial evidence for purposes of judicial review where the hypothetical questioning of the ALJ fairly encompasses an individual's significant limitations that are supported by the record); *see also Plummer*, 186 F.3d at 431; *Sanborn v. Colvin*, No. 13-224, 2014 WL 3900878, at *18 (E.D. Pa. Aug.11, 2014).

The ALJ determined that Plaintiff had the RFC to perform light work with limitations, which included that he must be able to sit and stand at will.  (Tr. 19). In his hypothetical to the VE, the ALJ included all the limitations from the RFC. (Tr. 53).  As discussed above, the VE addressed the hypothetical which included the sit and stand option, testified as to the erosion of the number of jobs available,

and explained that the sit and stand option was not explicitly mentioned in the DOT, however, her testimony is based upon her experience.  (Tr. 54).

As this Court has previously noted "the VE's observation that these positions allow change of position at will, is appropriately viewed as a vocational expert's application of her expertise . . . . Her reduction in the number of positions based on the conflict is similarly appropriate."  *Orndorff v. Colvin*, No. 1:14-CV-2465, 2016 WL 1450172 (M.D. Pa. Apr. 13, 2016) (internal citation omitted).  In this context, the ALJ would be under no obligation to elicit further testimony from the VE on the sit/stand issue for the positions for which the VE testified a reduction in numbers would be appropriate based on this limitation.

Plaintiff also asserts that the ALJ lacked substantial evidence at step five because he posed an incomplete hypothetical regarding Plaintiff's mental limitations to the expert.  Pl. Brief at 40-43.  An "'ALJ must accurately convey to the vocational expert all of a claimant's *credibly established limitations*' [and] does not have 'to submit to the vocational expert every impairment *alleged* by a claimant.'"  *Hughes v. Comm'r Soc. Sec.*, No. 15-2253, 2016 WL 231676, at *3 (3d Cir. Jan. 20, 2016).  The Court notes that:

> [O]bjections to the adequacy of hypothetical questions posed to a vocational expert often boil down to attacks on the RFC assessment itself. That is, a claimant can frame a challenge to an ALJ's reliance on vocational expert testimony at step 5 in one of two ways: (1) that the testimony cannot be relied upon because the ALJ failed to convey limitations to the vocational expert that were properly identified in the

> RFC assessment, or (2) that the testimony cannot be relied upon
> because the ALJ failed to recognize credibly established limitations
> during the RFC assessment and so did not convey those limitations to
> the vocational expert. Challenges of the latter variety . . . are really
> best understood as challenges to the RFC assessment itself.

*Rutherford v. Barnhart*, 399 F.3d 546, 554, n. 8 (3d Cir. 2005).  As discussed

above, substantial evidence supports the ALJ's RFC.  The Court finds no merit to

this allegation of error.

## IV.    Recommendation

Therefore, the Court finds that the ALJ made the required specific findings

of fact in determining whether Plaintiff met the criteria for disability, and the

findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3);

*Brown*, 845 F.2d at 1213; *Johnson*, 529 F.3d at 200; *Pierce*, 487 U.S. at 552;

*Hartranft*, 181 F.3d at 360; *Plummer*, 186 F.3d at 427; *Jones*, 364 F.3d at 503.

Substantial evidence is less than a preponderance of the evidence, but more than a

mere scintilla of evidence. It does not mean a large or significant amount of

evidence, but rather such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

Thus, if a reasonable mind might accept the relevant evidence as adequate to

support the conclusion reached by the Acting Commissioner, then the Acting

Commissioner's determination is supported by substantial evidence and stands.

*Monsour Med. Ctr.*, 806 F.2d at 1190. Here, a reasonable mind might accept the relevant evidence as adequate.  Accordingly, it is HEREBY RECOMMENDED:

I.      This appeal be DENIED, as the ALJ's decision is supported by substantial evidence; and

II.     The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: March 13, 2017                    _____s/Gerald B. Cohn_____

                                         GERALD B. COHN

                                         UNITED STATES MAGISTRATE JUDGE